UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| OMARII MCCLEARY, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | Case No. 3:23-cv-385 |
| v. | ) ) | Judge Curtis L. Collier |
| QCHC OF TENNESSEE, PLLC, et al., | ) ) | Magistrate Judge Debra C. Poplin |
| Defendants. | ) ) | |

# **MEMORANDUM**

Before the Court are two motions for summary judgment. One is a motion for summary judgment by Defendants QCHC of Tennessee, PLLC ("QCHC")[1] and Johnny Bates, MD, Holly Cantrell, Pamela Hollingshead, Ladonna Hubbard, Julie Johnston (misnamed in the Complaint as "Nurse Julie"), and Donald Kern, MD ("Medical Defendants"). (Doc. 151.) The second is a motion for partial summary judgment by Plaintiff Omarii McCleary against QCHC. (Doc. 148.)

## I. BACKGROUND

This case stems from the death of Plaintiff's Decedent, Joshua McCleary, while he was a pretrial detainee at Monroe County Jail from October 28, 2022, through October 31, 2022. (Doc. 177 at 5, 11.) Mr. McCleary was detained (Doc. 169 at 5), filled out a form that stated he was a diabetic (Doc. 148-4 at 1), and then did not receive his insulin for four days (148-14 at 1). He was transported to Sweetwater Hospital on October 31, 2022, and eventually passed away from diabetic

---

[1] Plaintiff filed this action against QCHC of Tennessee, PPLC, QCHC, Inc., and QCHC Management Services Company, Inc.. Throughout this litigation, Plaintiff has not differentiated between the Defendants nor alleged any distinct theories of liability. (Doc. 187 at 1, n.1.) Plaintiff alleges that "Defendants share common managers, common owners, and common control over the policies and personnel decisions and medical services they provide." (Doc. 1 at 4.) Therefore, this opinion treats them as a single entity.

ketoacidosis three days later. (Doc. 148-17 at 1.) QCHC and Medical Defendants move for summary judgment (Doc. 151.) Plaintiff moves for summary judgment against QCHC only. (Doc. 148.)

### A. Facts Relevant to QCHC's Liability

The facts relevant to QCHC's liability are as follows.

Monroe County, Tennessee (the "County") entered into a contract with QCHC for the provision of healthcare services. (Doc 153-3.) The County desired to contract with QCHC to provide these services "pursuant to [its] obligations under the Constitution of the United States of America, the Constitution of the State of Tennessee, any applicable statutes, judicial orders or decisions, and any other applicable sources of law." (*Id*.) (emphasis omitted.) QCHC agreed to provide primary healthcare services for all those committed to the custody of the jail and to provide staffing coverage to the jail as necessary. (*Id.* at 2.)

When Mr. McCleary arrived at Monroe County Jail for booking on Friday, October 28, 2022, Senior Officer Brent Plemons filled out an intake form, which reported that Mr. McCleary had diabetes and was taking medication. (Doc. 148-4 at 1.) What was supposed to happen next with that form is unclear. QCHC had a written policy that physical assessments should be completed "as soon as practicable," but "in no event longer than 14 days from intake." (Doc. 153-3 at 2.) There was no further written policy on what nurses should do with those intake forms. (*See* Doc. 153-11.)

According to Nurse Pamela Hollingshead, the practice was to check the intake boxes daily for new forms and then categorize the physical assessments by those inmates who needed to be seen within twenty-four hours and those inmates who could wait several days. (Doc. 153-12 at 57.) According to Nurse Ashley Brown, there was no such practice, and nurses went to check the

2

intake boxes for forms whenever there was a lull in work. (Doc. 153-2 at 8, 9.) She testified that correctional officers who filled out those intake forms were to contact the nurses if there was an inmate who needed immediate medical attention. (*Id.*) Officer Colby Williams stated that there was no such policy. (Doc. 148-7 at 7.)

It is further disputed what level of training the nurses were given on these intake forms and on the continuity of medication. Nurse Brown stated that there was no shadowing or training when she began her contract with QCHC. (Doc. 153-2 at 20.) She stated that she assumed she was told to check the inbox for intakes from time to time. (*Id.*) But Nurse Hollingshead stated that she was trained to check the inbox daily. (Doc. 153-12 at 54–56.)

It is also disputed what kind of medical staffing was available during nights and on the weekends. QCHC's contract stated that there would be primary medical services available on a twenty-four hour a day, seven day per week basis. (Doc. 148-1 at 37; Doc. 148-11 at 6, 10; Doc. 148-13 at 13.) The contract also stated that the facility would provide twenty-four-hour emergency medical, dental, and mental-health services, and that there is a practitioner on call. (Doc. 153-11 at 12.) But Nurse Hollingshead stated that there was never twenty-four-hour coverage, and that she would offer to be on-call at nights "out of the goodness of [her] heart," despite not being paid for such work. (Doc. 148-11 at 7.) Nurse Brown stated that she maintained a phone for emergency contacts in the evening. (Doc. 153-2 at 16.) On the night of October 30, 2022, through the morning of October 31, 2022, there was no medical staff member on site. (Doc. 148-7.)

B.   **Facts Relevant to Medical Defendants' Liability**

QCHC also employed several doctors and nurses. Plaintiff has abandoned his claims against Defendants Ladonna Hubbard, Sherry Richesin, Julie Johnston, and Holly Cantrell. (Doc. 175 at 9.) He also abandons his official-capacity claims against Dr. Bates and Dr. Kern. (Doc.

3

175 at 15.) Left are individual capacity claims against Dr. Bates, Dr. Kern, and Nurse Hollingshead. Because only Medical Defendants, and not Plaintiff as to Plaintiff's claims against Medical Defendants, move for summary judgment, all facts as to Medical Defendants are presented in the light most favorable to Plaintiff. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Dr. Bates is the CEO and founder of QCHC of Tennessee. (Doc. 153-9 at 1, ¶¶ 4–5.) He is a medical doctor who also saw patients at the Monroe County Jail and other facilities. (*Id.*) He did not work at the jail, interact with Mr. McCleary, or receive any telephone calls related to Mr. McCleary. (*Id.* ¶¶ 6–9.)

Dr. Kern is a Medical Director for QCHC. (Doc. 153-10 at 2, ¶ 5.) He traveled to jails that contracted with QCHC, evaluated patients, reviewed medical charts, and oversaw QCHC's Nurse Practitioners. (*Id.*) The officers did not have the phone number of either doctor. (Doc. 148-5 at 11.) Neither Dr. Bates nor Dr. Kern knew about Mr. McCleary's death until after he passed away. (Doc. 153-9 at 2, ¶ 10; Doc. 153-10 at 2, ¶ 10.)

Nurse Hollingshead is a nurse who was employed as a licensed practical nurse by QCHC to provide services at Monroe County Jail in October 2022. (Doc. 153-5, ¶ 2–4.) She stated that she did not work from October 29, 2022, through October 31, 2022, while Mr. McCleary was incarcerated at Monroe County Jail. (*Id.* at ¶ 6.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In assessing whether summary judgment is warranted, courts must "draw all reasonable inferences in favor of the nonmoving party." *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 316 (6th Cir. 2014).

In doing so, the court should consider "the plethora of material available in the record" to determine whether the moving party is entitled to judgment as a matter of law, including "pleadings, depositions, answers to interrogatories, written admissions, transcripts of evidence, and written stipulations of fact." *Doe v. Univ. of Ky.*, 111 F. 4th 705, 715 (6th Cir. 2024). The court should "consider whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986). While the movant bears the burden of establishing that there is no genuine dispute of material fact, she "can meet that standard by showing that the non-moving party lacks evidence to support an essential element of her case." *Randle v. Lewis,* No. 24-1888, 2025 U.S. App. LEXIS 10728, at *10 (6th Cir. May 1, 2025). However, "a party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record." *Celotex Corp. v. Catrett*, 77 U.S. 317, 332 (1986).

### III. <u>DISCUSSION</u>

The Court will address QCHC's liability first and Medical Defendants' liability second.

#### A. QCHC

In *Monell v. New York City Department of Social Services.*, 436 U.S. 658 (1978), the Supreme Court recognized liability for municipalities under 42 U.S.C. § 1983. The Court held that while a local government "may not be sued under § 1983 for an injury inflicted solely by its employees or agents," a local government may be sued "when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694.

There are four recognized *Monell* claims: "(1) an illegal or unconstitutional official policy, (2) ratification of illegal or unconstitutional actions by a policymaker, (3) illegal or unconstitutional actions stemming from a failure to train or supervise, and (4) a custom of tolerance or acquiescence of federal rights violations." *Gifford v. Hamilton Cnty.*, No. 24-5893, 2025 U.S. App. LEXIS 13293 at *7 (6th Cir. May 30, 2025). Plaintiff points to eight policies, practices, or customs by both QCHC and the County that allegedly led to Mr. McCleary's death. (Doc. 148 at 18.) While Plaintiff does not specify under which theories he brings his claims against QCHC, the Court deduces that Plaintiff is bringing both claims of an unconstitutional policy and a failure to train. The Court will address the evidence under those theories.

To show an illegal or unconstitutional policy, a claim based on an official policy must identify the policy, connect it to the entity, and show that the particular injury was incurred because of the execution of the policy. *Kensu v Corizon Inc.*, No. 22-1493, 2023 U.S. App. LEXIS 3107, at *5 (6th Cir. Feb. 7, 2025). If the policy is not facially unconstitutional, the plaintiff "must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences." *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (citation omitted).

A city may be held liable for failure to train its employees "only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 347, 389 (1989). It is not enough to plead that "an otherwise sound program has occasionally been negligently administered," nor is it enough to plead that an injury "could have been avoided if an officer had had better or more training." *Id.* at 391.

There are two ways to establish a failure-to-train claim. A plaintiff can show either a pattern of similar constitutional violations by untrained employees and a "continued adherence to an approach that it knows or should know has failed to prevent tortious conduct by employees," or he can establish a single violation of federal rights that, combined with a showing that the entity has failed to train its employees to handle recurring situations, presents an obvious potential for a constitutional violation. *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 739 (6th Cir. 2015).

Private companies can also be held liable under § 1983 if they are acting under color of state law. The Court of Appeals has extended *Monell* liability to apply to private companies that contract with prisons if those private companies are performing a traditional state function. *Id.* at 736 ("Our court has held that private corporations performing traditional state functions, such as the provision of medical services to prison inmates, act under color of state law for purposes of § 1983."); *see also Warman v. Mount St. Joseph Univ.*, 144 F.4th 880, 892 n.4 (6th Cir. 2025); *Street v. Corr. Corp.*, 102 F.3d 810, 814 (6th Cir. 1996).

Plaintiff has brought forth sufficient evidence to raise a genuine dispute of material fact as to whether QCHC is liable for (1) having an unconstitutional policy regarding its handling of intake forms, (2) failing to train employees on that policy, and (3) having an unconstitutional policy regarding overnight staffing of the jail, and whether any or all of these policies, practices, or customs constituted deliberate indifference. The Court will first address the processing of intake forms and then will address staffing.

### 1. Processing of intake forms

There is a genuine dispute of material fact as to what the policy was for processing intake forms and whether the nurses were trained on such a policy.

7

First, there is evidence that there was either an insufficient or nonexistent policy towards the handling of intake forms that, even if facially legal, could demonstrate deliberate indifference towards the serious medical needs of inmates. Simply having a policy that requires forms to be filled out by someone, without further instruction or review by medical personnel, may not be sufficient. If there was no policy to ensure that initial intake information was passed on to a medical provider, then there was no policy existing to ensure inmates would have continuity of medication or receive potentially urgent medical treatment.

There are fact disputes as to whether this was the case. QCHC's expert claims that "the practice and custom of QCHC nurses is to check the intake box for medical questionnaires completed by officers for incoming inmates every 24 hours." (Doc. 153-15 at 8). This is corroborated by Nurse Hollingshead, who stated that she was trained to look over booking records within twenty-four hours. (Doc. 153-12 at 57.) But that differs from Nurse Brown's understanding of QCHC's practice, which did not require nurses to check the box every twenty-four hours. Rather, in her understanding, she would "go up [to booking] at some point in time and [she] would grab this stack of intakes that they would have," but "if there was a medical condition … they were to call Medical, let us know." (Doc. 153-2 at 8–9). According to her, the correctional officers were to call the nurses to alert them if there was an inmate who needed care within twenty-four hours. (Doc. 153-2 at 8.) She said that the nurses would try to go up at least once a day if they could, but that there was no policy that stated they should go at a certain time. (Doc. 153-2 at 17.) Nurse Brown's understanding of the custom was to go and check for new intake forms when there was a lull in work. (*Id.* at 18.)

QCHC's written policy also differs from the assertion that "the practice and custom of QCHC nurses is to check the intake box for medical questionnaires completed by officers for

8

incoming inmates every 24 hours." (Doc. 153-15 at 8.) Its policies state that "[a]ll patients receive an initial health evaluation as soon as possible, but no later than 14 calendar days after admission to the facility." (Doc. 153-11 at 6.) QCHC's procedures state the nurses will attempt to identify a prescription if a patient states that he is taking a medication at the time of the intake screening. (*Id.* at 2.) And the intake form includes a "reviewed by" space, but that was not filled out in this case. (Doc. 140-1 at 3.) Despite this, there is evidence that there was not a policy about the timing of that review or how to handle exigent needs for medication. A reasonable jury could find that this written information, along with Nurse Brown's testimony, constituted a policy that delayed necessary medical treatment for nonmedical reasons. *See Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 585 (3rd. Cir. 2003) (finding that a jury could find *Monell* liability where "[t]here was no policy ensuring that an inmate having need of medication for a serious medical condition would be given that medication during the first 72 hours of his incarceration," and that lack of policy to address serious medical needs could constitute deliberate indifference.")

The record contains conflicting testimony of two nurses about what the policy was towards reviewing intake forms and ensuring continuity of medication. Neither account is consistent with QCHC's written policy. A reasonable jury could find that there was an insufficient or nonexistent policy. Or, a reasonable jury could find that the policy, practice, or custom was for nurses to check the inbox every twenty-four hours, and that Nurse Brown simply failed to follow such a policy, practice, or custom. A reasonable jury could even find that a policy that requires nurses to check only every twenty-four hours is constitutionally insufficient to ensure continuity of medication, for example, that needs to be administered more frequently than every twenty-four hours. Because a reasonable jury could view the evidence several ways, neither party has demonstrated that they

9

are owed summary judgment on whether QCHC's policy, practice, or custom towards inmate intake was deliberately indifferent to inmates' serious medical needs.

There are factual questions as to what the policy was and whether any such policy is constitutionally adequate. But there are also factual questions as to the level of training received by nurses and whether this training meets constitutional muster. Because of these questions, a jury could also find for either Plaintiff or QCHC on Plaintiff's failure-to-train claim.

For single-incident liability, courts in the Sixth Circuit have grappled with the liability of private medical providers and the need for training to avoid obvious risks. Courts have held that where such single-incident liability might fail against police officers, the same claim may succeed "for a private healthcare provider that specifically contracts to provide medical personnel to a prison for the purpose of approving medication requests for inmates." *See Victor v. Reynolds*, 582 F. Supp. 3d 516, 524 (E.D. Mich. 2022); *see also Smolinski v. Advanced Corr. Healthcare, Inc.*, No. 1:23-cv-10998, U.S. Dist. LEXIS 180006 at *32 (E.D. Mich. Oct. 5, 2023) (finding single incident liability in a failure-to-train case because it is "quite obvious" that ACH employees would require adequate training on following prescribed treatment plans and determining when a medical condition requires referral because "it is quite obvious that ACH employees need to make such determinations frequently"). This is because there are some risks that require training to avoid and that need for training would be obvious to a private medical company.

Here, Plaintiff has presented enough evidence for a reasonable jury to find that there was a failure to train nurses to handle recurring situations regarding detainees who have an immediate need for medication. The record suggests that such a policy was not in the QCHC manual and at least one nurse does not recollect any custom of checking the inbox at least every twenty-four hours. (*See* Doc. 153-2 at 8–9, 16). QCHC and Medical Defendants argue that despite any

10

statements Nurse Brown made about what she perceived her training to be, "the undisputed proof demonstrates that she understood what the policy concerning intakes was and how to apply the policy.… she was trained that if an inmate/detainee needed medication, she was to perform the medical intake that day or within [twenty-four] hours." (Doc. 187 at 12–13.) But that "undisputed proof" is actually disputed. Nurse Brown testified that there was no written policy advising her of when to check the intake box, and she repeatedly testified that her understanding of the policy was to check the box if she had time and that she only needed to respond if a correctional officer contacted her about an inmate. (Doc. 153-2 at 16–18.) Nurse Brown also states that she was never taught to review these forms or fill out the "reviewed by" space, despite its presence on the form. (Doc. 153-2 at 9.)

If there was a policy, practice, or custom requiring the intake forms to be reviewed daily and the nurses were not trained on it, that could create an obvious risk of recurring violations. This single incident reflects the risk that detainees with immediate, serious medication needs would be neglected, because if nurses are not trained on how to get the inmates' information, there is a risk that no one knows that someone needs medication. The risk that someone does not get essential medicine requires training and adherence to protocols to avoid. The need for training to ensure continuity of medication is so obvious that a failure to train nurses on such a policy could constitute deliberate indifference.

But a reasonable jury could also find that QCHC adequately trained their employees. Nurse Hollingshead, for example, testified that when she was first hired, she was shown how to handle intakes. (Doc. 153-12 at 55.) She was shown that nurses "automatically get [their] intake, see what [their] priorities are, so [they] can plan their day." (*Id.*) She said she "was always trained 24 hours" when asked about how long nurses had to look over booking records. (*Id.* at 56.) A jury

11

Case 3:23-cv-00385-CLC-DCP   Document 231   Filed 09/29/25   Page 11 of 20
PageID #: 2637

must decide both the disputed facts about what training nurses received as well as whether that training was adequate.

## 2. Staffing

There is also evidence that QCHC had an unconstitutional policy regarding staffing. Plaintiff points out that QCHC did not staff the facility in line with the contract. (Doc. 148 at 19.) QCHC is correct that "[d]eliberate indifference under 24 U.S.C. § 1983 is not a contractual matter defined by contracting parties," but rather it is a "constitutional standard." (Doc. 152 at 23.) But those violations, if they independently demonstrate a policy or custom that constitutes deliberate indifference, could still be sufficient to support a claim under § 1983.

Here, Plaintiff has presented such evidence. Nurse Hollingshead testified that there was no twenty-four-hour coverage during October 2022 and that nurses would put themselves on call "out of the goodness of [their] hearts." (Doc. 153-12 at 24–25.) [2] There is evidence that there was no nurse present on the night Mr. McCleary experienced his diabetic crisis. (Doc. 148-2.) There is also evidence that "at the time that Mr. McCleary experienced his diabetic crisis … no nurse or medical provider would have been formally on-call for the security staff to contact." (Doc. 153-12 at 46).

Of course, many prisons face staffing issues. *See, e.g.,* David L. Rosen *et al., Jail Healthcare Staffing in the US Southeast: a Cross-Sectional Survey*, J. Gen. Internal Med., Mar. 2024. The failure to have comprehensive staffing does not automatically create a constitutional violation without a causal link. *See Pineda v. Hamilton Cnty.*, 977 F.3d 483, 490–91 (6th Cir. 2020) ("The Supreme Court has long required proof of a causal connection between the

---

[2] The attorney initially misspoke and referenced October 2021, but later corrected himself and the witness clarified that all of the answers she had given about staffing levels and policies were true for 2022. (Doc. 153-12 at 39.)

defendant's unconstitutional action and the plaintiff's injury.") But here, Plaintiff has presented evidence of a causal link between the failure to staff the prison or provide any overnight care and his condition. For example, he presented evidence that correctional staff attempted to check Mr. McCleary's blood glucose, the machine returned what the officers thought was an error code, but that code was actually a reading of 'HI,' 'HIGH,' or a code indicating hyperglycemia. (Doc. 148-12 at 2; *see also* Doc 148-6 at 10.) Had a medical professional been available, he or she might have understood such a reading. Even Officer Plemons testified that "not having the staff of medical staff at the time" was part of the breakdown that led to Mr. McCleary's death. (Doc. 148-5 at 14.)

The facts of this case are a stark contrast to the facts in *Stewart v. Hensley*, No. 0:30-008, 2023 U.S. Dist. LEXIS 247261 at *25 (E.D. Ky. Jan. 13, 2023), which granted defendants summary judgment on a deliberate-indifference claim that arose, in part, from an allegation that the prison did not have enough medical staffing. There, the plaintiff had not "identified any evidence indicating that there was a nursing shortage during the specific period that [the plaintiff] was incarcerated or that a lack of staffing led to [the plaintiff's] harm." (*Id.*) Here, Plaintiff has presented evidence from which a reasonable jury could find that it was a policy, practice, or custom of the jail to have no overnight medical staffing either in the jail or on call and that the lack of staffing led to Mr. McCleary's harm.

But a reasonable jury could find that there was not a policy of unconstitutionally inadequate staffing. QCHC presented evidence that the officers overnight had access to medical staff and that "the policy procedure was to call medical" when an inmate expressed medical concerns overnight. (Doc. 153-14 at 6.) They also presented evidence that officers had the authority to call 911 and send inmates to the hospital if there was a medical emergency overnight. (*Id.* at 7.) And whether

a lack of overnight staffing constitutes deliberate indifference to medical needs is a question for the jury. A reasonable jury could find that such staffing was not necessary and that officers' training on emergency protocols was sufficient. A reasonable jury could also find that inadequate staffing was not the cause of Mr. McCleary's death. These are all factual disputes that a jury should resolve, precluding summary judgment for QCHC.

Therefore, the Court will **DENY** both QCHC's (Doc. 151) and Mr. McCleary's (Doc. 148) motions for summary judgment as to QCHC.

### B. Medical Defendants

Several doctors and nurses from QCHC, who were sued individually, also move for summary judgment. The only claims left are individual-capacity claims against Dr. Bates, Dr. Kern, and Nurse Hollingshead, because Plaintiff abandons his claims against the other originally named medical defendants and abandons his official-capacity claims against Dr. Bates and Dr. Kern. (Doc. 175 at 9.)

As a preliminary matter, these Defendants were operating under the color of law for purposes of § 1983 liability. *See Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008) (finding that a nurse who was hired by a private medical company that contracted with a prison could be held liable under § 1983).

The Eighth Amendment imposes duties on prison officials, who must "ensure that inmates receive adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994). A prison official violates the Eighth Amendment when the deprivation is sufficiently serious and the official demonstrates deliberate indifference to inmate health and safety. *Id*. at 834. For Eighth Amendment claims, this is a subjective standard requiring officials to both know of and disregard an excessive risk to inmate health and safety. *Id.* But for Fourteenth

14

Case 3:23-cv-00385-CLC-DCP   Document 231   Filed 09/29/25   Page 14 of 20
PageID #: 2640

Amendment claims such as the present claim, that standard is different. The constitutional status of pretrial detainees differs from that of convicted prisoners because pretrial detainees … cannot be punished at all, much less 'maliciously and sadistically.'" *Brawner v. Scott Cnty.*, 141 F.4th 585 (6th Cir. 2021). This follows from the Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), which found that an objective standard applies for Fourteenth Amendment claims by pretrial detainees.

This Circuit has held that for Fourteenth Amendment pretrial-detainee medical-care claims, a pretrial detainee must show that a defendant acted not only deliberately, but also recklessly. *Brawner*, 14 F.4th at 597 (6th Cir. 2021). To show that an official violated a pretrial detainee's right to adequate medical care, a plaintiff must show (1) that the plaintiff had a sufficiently serious medical need and (2) that each defendant acted deliberately (not accidentally), and also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known. *Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 317 (6th Cir. 2023).[3] At the second prong, this Court must "evaluate each defendant individually." *Greene v. Crawford Cty.*, 22 F.4th 593, 607 (6th Cir. 2022). Therefore, this court will address the doctors and nurse in turn, taking the facts in the light most favorable to Plaintiff.

1. **Dr. Bates and Dr. Kern**

Plaintiff maintains his claims against Dr. Bates and Dr. Kern in their individual capacities. However, Plaintiff has not presented any evidence that creates a genuine dispute of material fact

---

[3] The Sixth Circuit has gone back and forth on this issue. In *Trozzi v. Lake County.*, 29 F.4th 745, 757–58 (6th Cir. 2022), the Sixth Circuit read *Brawner* to include a subjective element in the deliberate indifference calculus, which later courts in *Helphenstine* and *Grote v. Kenton County.*, 85 F. 4th 397, 405–06 (6th Cir. 2023) decided was the improper standard.

as to the liability of either of these defendants either through their own deliberate indifference or through supervisory liability.

Plaintiff has put forth no evidence that either of these Defendants violated Mr. McCleary's Fourteenth Amendment rights through deliberate indifference to his serious medical needs. Defendants have shown that neither Dr. Bates nor Dr. Kern worked any shifts from October 28, 2022, through October 31, 2022, at Monroe County Jail. (Doc. 153-9 ¶¶ 6–10, Doc. 153-10 ¶¶ 6–10.) Both doctors testified that they did not interact with or treat Mr. McCleary, that they were not notified that a diabetic detainee was booked on October 28, 2022, at Monroe County Jail, that they were not contacted by telephone about Mr. McCleary during that time period, and that they were not aware of Mr. McCleary's medical condition until after he passed away. (Doc. 153-9 ¶¶6–10, Doc. 153-10 ¶¶ 6–10.) Plaintiff has not brought forth any evidence to the contrary. Because neither doctor knew or had reason to know of Mr. McCleary's existence or condition, they could not have been deliberately indifferent towards his serious medical needs. *Helphestine*, 60 F.4th at 321 (affirming grant of summary judgment as to two county defendants who had "no reason to know that [the plaintiff] was suffering a serious medical need.")

Plaintiff also argues for supervisory liability. Plaintiff argues that "Defendants Bates and Kerns [sic] failed to properly supervise, train, or even staff the jail." (Doc. 175 at 15–16.) Plaintiff argues that each Defendant is liable because they are responsible "for establishing QCHC's policies and ensuring staffing." (*Id.* at 15.) To support this claim, he cites evidence that neither Nurse Brown nor Nurse Hollingshead was properly trained.

Plaintiff is essentially re-alleging his *Monell* claims as claims against these individual defendants under supervisory liability. The Court of Appeals has been clear that "a supervisory official's failure to supervise, control, or train the offending individual is not actionable unless the

supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Sheehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). Supervisory liability under § 1983 "must be based on active unconstitutional behavior and cannot be based on a mere failure to act." *Id.* Here, there is no evidence that either doctor knew of any unconstitutional behavior, let alone that they encouraged or acquiesced in it.

Accordingly, the Court will **GRANT IN PART** Defendants' motions for summary judgment as to Dr. Bates and Dr. Kern. (Doc. 151). The claims against Dr. Bates and Dr. Kern will be **DISMISSED WITH PREJUDICE**.

      **2.**      **Nurse Hollingshead**

Plaintiff also argues that Nurse Hollingshead exhibited deliberate indifference towards Mr. McCleary's serious medical needs. (Doc. 175 at 12.) Nurse Hollingshead left work at 6:58 p.m. on Friday, October 28, 2022. (Doc. 153-5 at 1.) She did not work at the jail, nor did she interact with or treat Mr. McCleary, from October 29, 2022, through October 31, 2022. (*Id.* at 2.) Plaintiff does not allege any facts to suggest that Nurse Hollingshead took any action or recklessly failed to take action in the face of a serious medical need. In fact, there is no admissible evidence that Nurse Hollingshead knew of Mr. McCleary's condition at any point nor that she should have known about his condition and failed to take action.

The only piece of evidence to support that Nurse Hollingshead possibly knew or should have known of Mr. McCleary's condition is inadmissible. Officer Kennedy said in his deposition that Officer Colby told him that he called the on-call nurse overnight, and that the on-call nurse could have been either Nurse Brown or Nurse Hollingshead. (Doc. 148-6 at 12.) Officer Kennedy testified that he believed this call was made to "Pam." (*Id.*) If this is true, Plaintiff argues, then there is a genuine issue of material fact as to whether Nurse Hollingshead did know of Mr.

McCleary's condition and failed to act. (Doc. 175 at 8) Defendants argue that this evidence is inadmissible hearsay, and thus, cannot be considered in determining the motion for summary judgment. Fed. R. Civ. P. 56(c)(2). (Doc. 152 at 25.) Plaintiff did not address this objection in a reply. The Court agrees with Defendants.

Supporting affidavits must "set out facts that would be admissible in evidence," and parties may object that a fact is not supported by admissible evidence. Fed. R. Civ. P. 56(c)(2, 4). Hearsay is an "out-of-court statement offered to prove the truth of the matter asserted." *Wylie & Sons Landscaping, LLC. V. FedEx Ground Package Sys.*, 696 Fed. Appx. 717, 721 (6th Cir. 2017); Fed. R. Evid. 801(c).

Officer Kennedy stated in his deposition that Officer Williams said he made a phone call to medical. (148-6 at 12.) Officer Kennedy would be testifying to Officer Williams's statement. The truth of the matter asserted is that Officer Williams did, in fact, make a phone call to medical. And it is being offered to show that Officer Williams did make a phone call to medical. Therefore, it is an out-of-court statement offered to show the truth of the matter asserted. *See* Fed. R. Evid. 801(c).

Statements of an opposing party offered against that party are, by their definition, not hearsay. But while Officer Williams is one of plaintiff's opponents, this does not clear the hearsay hurdle as to a summary judgment motion by Nurse Hollingshead. That is because the statement is offered against a different defendant. In considering motions for summary judgment, the Court of Appeals has held that "[u]nder Rule 802(d)(2)(A), a party's statement is admissible as non-hearsay only if it is offered against that party." *Stalbosky v. Belew*, 205 F.3d 890, 894 (6th Cir. 2000); *see also, e.g.*, *Butler v. McMahan*, No. 2:07-cv-88, 2009 U.S. Dist. LEXIS 53392 at *21–22 (E.D. Tenn. June 18, 2009) (finding that a statement of one defendant offered by the plaintiff against a

18

Case 3:23-cv-00385-CLC-DCP    Document 231    Filed 09/29/25    Page 18 of 20
PageID #: 2644

different defendant was still considered hearsay); *Canter v. Hardy*, 188 F. Supp. 2d 773, 783 (E.D. Mich. 2002) (finding that a statement of a defendant offered by plaintiff against a co-defendant was not admissible as a party admission and could not be considered in deciding a motion for summary judgment). A party admission "only lifts the hearsay bar as to the declarant-party who makes the admission." *United States v. Norwood*, No. 12-cr-20287, 2014 U.S. Dist. LEXIS 62308, at *12, n.3 (E.D. Mich. May 6, 2014).

Therefore, because the statement of Officer Williams is offered against a different defendant, it is not admissible under Fed. R. Evid. 801(d). Plaintiff has not presented any other hearsay exception or exemption that would render this evidence admissible at trial, and the Court cannot readily identify any apparent exceptions. Therefore, this statement may not be considered in deciding a motion for summary judgment.

Other than this statement, there is no evidence that Nurse Hollingshead had any interaction with Mr. McCleary or any of the officers about Mr. McCleary. Plaintiff has presented no admissible evidence that she either knew or should have known about Mr. McCleary's condition, or that she acted with deliberate indifference towards a serious medical need. Therefore, the Court will **GRANT IN PART** Defendants' motion for summary judgment (Doc. 151) as to Nurse Hollingshead. The claims against Nurse Hollingshead will be **DISMISSED WITH PREJUDICE.**

## IV. <u>CONCLUSION</u>

The Court will **GRANT IN PART** Defendants' motion for summary judgment as to Dr. Bates, Dr. Kern, Nurse Hollingshead, Ladonna Hubbard, Sherry Richesin, Dr. Johnston (originally misnamed in the complaint as "Nurse Julie"), and Holly Cantrell. (Doc. 151). The Court will **DISMISS WITH PREJUDICE** the claims against these Defendants.

Because genuine issues of material fact exist as to QCHC's liability, the Court will **DENY IN PART** Defendants' motion for summary judgment as to QCHC (Doc. 151). The Court will also **DENY IN PART** Plaintiff's motion for summary judgment as to QCHC (Doc. 148).

    **AN APPROPRIATE ORDER WILL ENTER.**

/s/_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**