UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| OMARII MCCLEARY, | ) |
| *Plaintiff*, | ) |
| | ) Case No. 3:23-cv-385 |
| v. | ) |
| | ) Judge Curtis L. Collier |
| QCHC OF TENNESSEE, PLLC, *et al.* | ) Magistrate Judge Debra C. Poplin |
| | ) |
| *Defendants*. | ) |

## **MEMORANDUM**

Before the Court is Plaintiff's motion for partial summary judgment as to Defendant Monroe County ("the County") (Doc. 148). Plaintiff filed an accompanying statement of undisputed material facts. (Doc. 149.) The County failed to respond to Plaintiff's motion for summary judgment, although it did file a response to Plaintiff's statement of undisputed material facts.[1] (Doc. 177.)

I. **BACKGROUND**

The County contracted with Defendant QCHC of Tennessee, PLLC ("QCHC") for the provision of healthcare services at the County's jail. (Doc. 177 at 1.)[2] The County desired to contract with QCHC to provide these services "pursuant to their obligations under the Constitution of the United States of America, the Constitution of the State of Tennessee, any applicable statutes,

---

[1] This response to the statement of undisputed material facts was filed late but deemed timely on Defendant's motion. (Doc. 197.)

[2] Plaintiff filed, and Defendant responded to, Plaintiff's statement of undisputed material facts in support of the instant motion. "Wherever possible, the Court cites undisputed facts per the parties' statements of undisputed material facts." *Buchanan v. Johnson & Johnson Consumer, Inc.*, 3:21-cv-340, 2024 U.S. Dist. LEXIS 247157, at *2 n.1 (E.D. Tenn. Dec. 5, 2024).

judicial orders or decisions, and any other applicable sources of law." (Doc. 153-3 at 1.) QCHC provided primary healthcare services for all those committed to the custody of the jail and agreed to provide staffing coverage to the jail as necessary. (Doc. 153-3 at 2; Doc. 177 at 1.)

QCHC was also to provide first aid/CPR, suicide prevention, and other training for the jail staff as requested by the sheriff. (Doc. 177 at 2.) There are disputes as to what training officers received. For example, it is disputed whether Defendant Officer Brent Plemons was trained to perform medical intakes. (Doc. 177 at 5-6.) It is also disputed whether correctional officers were trained on the recognition of symptoms of serious medical conditions. (Doc. 177 at 5.)

Plaintiff's Decedent Joshua McCleary arrived at Monroe County Jail for booking on Friday, October 27, 2022, at around 3:37 p.m. (Doc. 148-4 at 1.) Correctional Officer Brent Plemons filled out an intake form which stated that Mr. McCleary was a diabetic and was taking medication. (*Id.*) Officer Plemons also called the on-call nurse, Defendant Ashley Brown, and informed her of Plaintiff's diabetes and need for medication. (Doc. 177 at 5.) Overnight, Plaintiff informed correctional staff that he was diabetic and having issues with his blood sugar. (Doc. 177 at 8–9.) It is undisputed that QCHC left the jail unstaffed on the shifts over the course of Mr. McCleary's incarceration and diabetic crisis, except for a single employee between 5:30 p.m. and 9:02 p.m. on October 29, 2022. (Doc. 177 at 3.) There were no medical personnel present overnight that weekend except for this three-and-a-half-hour window. (*Id.*)

What happened next is disputed. Plaintiff alleges that late in the night of October 30, 2022, through the early morning of October 31, 2022, male correctional officers spoke with Mr. McCleary, obtained a blood glucose meter, and attempted to check Mr. McCleary's blood sugar. (Doc. 177 at 8–9.) Defendant disputes this. (*Id.*) Other than this attempt, Mr. McCleary did not receive any medical care overnight. The next morning, a corrections officer informed Nurse

Brown that Mr. McCleary had not received his diabetes medication. (Doc. 177 at 11.) He was transported to Sweetwater Hospital early in the morning on October 31, 2022, and passed away from diabetic ketoacidosis three days later. (Doc. 148-17 at 1.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In assessing whether summary judgment is warranted, courts must "draw all reasonable inferences in favor of the nonmoving party." *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 316 (6th Cir. 2014). The court should "consider whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986). While the movant bears the burden of establishing that there is no genuine dispute of material fact, she "can meet that standard by showing that the non-moving party lacks evidence to support an essential element of her case." *Randle v. Lewis,* No. 24-1888, 2025 U.S. App. LEXIS 10728, at *10 (6th Cir. May 1, 2025). However, "a party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record." *Celotex Corp. v. Catrett*, 77 U.S. 317, 332 (1986).

Failing to respond to a motion for summary judgment does not mean it will be automatically granted. *Siler v. Caruso*, No. 1:10-cv-97, 2011 U.S. Dist. LEXIS 11684 at *5 (W.D. Mich. Jan. 7, 2011) (quoting *Champion v. Artuz*, 76 F.3d 483, 486 (2d. Cir. 1996)). But when a party fails to respond, "nothing in either the Rules or case law supports an argument that the trial court must conduct its own probing investigation of the record." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 405 (6th Cir. 1992).

## III. DISCUSSION

Plaintiff alleges that Monroe County is liable under § 1983 for establishing a "policy, custom, or practice" that led to Mr. McCleary's death. (Doc. 148 at 17.) In *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court recognized § 1983 liability for municipalities. To hold a municipality liable under § 1983, a plaintiff must show a "municipal policy or custom" that was the "moving force" behind the constitutional violation. *Crabbs v. Scott*, 800 F. App'x. 332, 335–36 (6th Cir. 2020) (quoting *Monell*, 436 U.S. at 694). The Court held that while a local government "may not be sued under § 1983 for an injury inflicted solely by its employees or agents," a local government may be sued "when execution of a government's policy or custom… inflicts the injury [for which] the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694 (1978). This means there is no respondeat superior liability for municipalities.

There are four recognized *Monell* claims: "(1) an illegal or unconstitutional official policy, (2) ratification of illegal or unconstitutional actions by a policymaker, (3) illegal or unconstitutional actions stemming from a failure to train or supervise, and (4) a custom of tolerance or acquiescence of federal rights violations." *Gifford v. Hamilton Cnty.*, No. 24-5893, 2025 U.S. App. LEXIS 13293, at *7 (6th Cir. May 30, 2025). Plaintiff alleges eight policies, practices, or customs by both QCHC and the County that it believes led to Mr. McCleary's death. (Doc. 148 at 18.) Plaintiff does not state under which theory or theories he is pursuing his *Monell* claim nor is any particular theory readily apparent to the Court. The Court will address his claims under each theory.

### A. Illegal or Unconstitutional Policy

4

To show an illegal or unconstitutional policy, a claim based on an official policy must identify the policy, connect it to the entity, and show that the particular injury was incurred because of the policy. If it is not facially unconstitutional, the plaintiff "must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences." *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (quoting *Bd. Of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997).

Plaintiff does not identify which of the eight policies it attributes to Monroe County. Plaintiff later alleges that Monroe County is independently liable under *Monell* for "its failure to enforce basic medical intake procedures, staffing, and emergency response obligations." (Doc. 148 at 18.) In support of his argument for Monroe County's independent liability separate from QCHC, Plaintiff does assert that "the County had a duty to monitor staffing compliance and to intervene when contractual obligations were not met." (Doc. 148 at 19.) He also argues that "the County's inaction rises to the level of deliberate indifference because it knowingly allowed QCHC to operate without the infrastructure necessary to meet even minimal standards of care," and that the County's "decision to delegate final medical authority to QCHC – without ensuring those responsibilities were executed within constitutional boundaries – renders the County liable under Monell for the resulting violations of the Decedent's rights." (Doc. 148 at 20.)

Plaintiff does not cite to the evidentiary record to support any of his claims against the County. That alone precludes a grant of summary judgment to Plaintiff. *See* Fed. R. Civ. P. 56(c)(1)(A) (requiring parties to support factual positions by "citing to particular parts of materials in the record," and stating that courts "need consider only the cited materials"). Plaintiff has not pointed to any evidence in the record showing that the County had a policy of understaffing or a

5

policy of failing to enforce intake procedures and response obligations. In fact, Plaintiff has not cited to the record to support any claim against Monroe County separate from QCHC.

Plaintiff also fails to show either that these policies are unconstitutional or that they are facially legal but were instituted with deliberate indifference to known or obvious risks. Nor does Plaintiff identify any causal link between these policies and Mr. McCleary's death beyond a conclusory statement that "these failures directly led to the Decedent being booked without a clinical assessment, housed without necessary insulin, and left without care during critical overnight hours while in visible medical distress." (Doc. 148 at 19.) When policies are facially legal, "the climb is even greater," and courts "must apply rigorous standards of culpability and causation [to keep] *Monell* liability from collapsing into de facto respondeat superior liability." *Hall v. Navarre*, 118 F. 4th 749, 757 (6th Cir. 2024). Plaintiff has not provided evidence that these policies existed, that they were instituted with deliberate indifference to obvious risks, or that any or all of these policies were the cause of Mr. McCleary's death.

### B. Ratification

Plaintiff also points to actions and inaction by QCHC and seeks to hold the County liable for such actions because QCHC was a "final policymaker" for Monroe County Jail. (Doc. 177 at 18.) To show *Monell* liability on a ratification theory based on a single act, Plaintiff must show that the actor in question was a "policymaker with final policymaking authority." *Burgess v. Fischer*, 735 F.3d 462 (6th Cir. 2013).[3] Under this theory, municipal liability under § 1983 attaches

---

[3] It does not appear that Plaintiff is attempting to proceed on a theory of ratification of a "history or pattern of unconstitutional decision-making by the policymakers." *See Hester v. Chester Cnty.*, 2024 U.S. Dist. LEXIS 137323 at *23 (W.D. Tenn. Aug. 2, 2024). Plaintiff has not presented any evidence to support a history or pattern of unconstitutional decision making by policymakers of Monroe County.

only where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*¸ 475 U.S. 469, 483 (1986). Authority to exercise discretion does not make a municipal employee a final policymaker "unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993). To determine whether an individual is a final policymaker, courts resort to state law. *Id.*

Plaintiff alleges that "QCHC, through its medical director and health services administrator serve as the County's final policymaker for the Jail." (Doc. 148 at 18.) It is unclear whether Plaintiff is pointing to QCHC as a final policymaker or Dr. Johnny Edward Bates and Dr. Donald Kern, QCHC's medical director and health services administrator.[4] But Plaintiff does not provide any evidence that either these two individuals, or QCHC as an entity, operates as the final decisionmaker for Monroe County. There is no evidence in the record detailing their duties, the limitations on their authority, and whether actions were reviewable. *See Glenn v. Corizon Healthcare, Inc.*, No. 17-10972, 2019 U.S. Dist. LEXIS 74907, at *3 (E.D. Mich. May 3, 2019) (granting Defendant's motion for summary judgment because there was not "any evidence in the

---

[4] It is unclear whether a company in its entirety can be considered a final policymaker. The Supreme Court refers to "official or officials" in laying out the standard for someone with final policymaking authority. *Pembaur v. City of* Cincinnati, 475 U.S. 469, 483–84 (1986); *see also St. Louis v. Praprotnik*, 485 U.S. 112, 123-24 (1988) (referring to whether a "particular official" has final policymaking authority). Neither the Supreme Court nor the Court of Appeals for the Sixth Circuit has squarely addressed this question. Other courts have entertained arguments that a private company can be an official policymaker. *See, e.g., Mathis v. Sw. Corr., LLC*, No. 5:20-cv-146, 2021 U.S. Dist. LEXIS 173301 at *21 (E.D. Tex. June 15, 2021). This opinion should not be construed as holding that a company can be a final policymaker. This Court does not need to decide the question because Plaintiff has not presented sufficient evidence to create an issue as to this question. In other words, the denial of summary judgment is based on a lack of evidence, not on whether QCHC can be a final policymaker.

7

record regarding the duties and limitations on authority of these four individuals," referring to four defendants identified as potential policymakers). The fact that the County contracted with QCHC to operate as its healthcare provider does not alone establish, as a matter of law, that QCHC or its medical director and health services administrator are, in fact, final policymakers, without any additional evidence about the roles and responsibilities of these individuals or a better understanding of how QCHC operates in relation to the County. A mere contract for the provision of medical services does not establish final policymaker authority. *See, e.g., Mixon v. Pohlmann*, No. 20-1216, 2022 U.S. Dist. LEXIS 131160, at *19 (E.D. La. July 25, 2022) (finding that a sheriff was the final policymaker for a county as to healthcare even where a parish contracted with a private medical provider to provide services to pretrial detainees in jail).

Because Plaintiff has not presented any evidence supporting its assertion that QCHC, Dr. Bates, or Dr. Kern served as final policymakers for the County, Plaintiff's arguments about QCHC's conduct fail to establish, as a matter of law, municipal liability on behalf of the County.

### C. Failure to Train

A failure-to-train lies "where a municipality's failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of its inhabitants." *City of Canton v. Harris*, 489 U.S. 347, 388 (1989). Only in those cases can "such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983." *Id*. It is not enough to plead that "an otherwise sound program has occasionally been negligently administered," nor is it enough to plead that an injury "could have been avoided if an officer had had better or more training." *Id.* at 391.

There are two ways to establish a failure-to-train claim. A plaintiff can show either a pattern of similar constitutional violations by untrained employees and a "continued adherence to

8

Case 3:23-cv-00385-CLC-DCP   Document 234   Filed 10/01/25   Page 8 of 11
PageID #: 2661

an approach that it knows or should know has failed to prevent tortious conduct by employees," or he can establish a single violation of federal rights that, combined with a showing that the entity has failed to train its employees to handle recurring situations, presents an obvious potential for a constitutional violation. *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 739 (6th Cir. 2015). It is unclear under which of these theories Plaintiff proceeds.

Out of Plaintiff's list of policies, two can be construed as failure-to-train claims: "failing to train guards in the conduct of intake screenings or to ensure that medical personnel conducted intake screenings" and "failing to train guards in symptom recognition." (Doc. 148 at 18). If proceeding under a pattern theory, Plaintiff has not shown any evidence of a pattern of similar constitutional violations by untrained employees. Nothing in the record suggests that Monroe County jail had a pattern of untrained guards who were ill equipped to address medical emergencies.

To the extent Plaintiff is proceeding under the single violation theory, Plaintiff has not presented the necessary evidence to show that the County is liable under *Monell* as a matter of law. There are genuine disputes of material fact as to the level of training officers received in symptom recognition and the conduct of intake screenings. (Doc. 177 at 5; 6-7). Some officers said there was at least some level of training to recognize symptoms of some conditions, like a heart attack or stroke. (Doc. 148-5 at 6.) Others said there was no training on how to identify a serious medical condition or what to do if an inmate reported a serious medical condition and medical staff were not available. (Doc. 148-6 at 11.)

Along with these disputes as to what training officers actually received, there is also a genuine question as to whether such a lack of training presents an obvious potential for a constitutional violation. Plaintiff has not shown that this single incident was combined with a

recurring failure to train officers and that this failure presented an obvious risk of constitutional violations. A reasonable jury could find, for example, that the fact that officers were only trained to recognize basic medical emergencies does not create an obvious risk of a constitutional violation, especially if there was a policy of twenty-four-hour medical coverage. (Doc. 148-7 at 5; Doc. 148-1 at 31.)

Genuine issues of material fact exist as to what training Monroe County correctional officers received, whether that level of training obviously presented a risk of a constitutional violation, and whether officers were untrained to handle recurring situations.

### D. Custom of tolerance

The fourth possible *Monell* claim is a claim of a custom of tolerance or acquiescence of federal rights violations. Under this theory, a plaintiff must show

> "(1) a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of the defendant; (3) the defendant's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the defendant's custom was the moving force or direct causal link in the constitutional deprivation."

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (alterations in original) (quoting *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996)). A "[f]ailure to investigate can constitute a custom of tolerance rising to the level of deliberate indifference." *Davis v. City of Columbus*, No. 2:17-cv-823, 2021 U.S. Dist. LEXIS 183921 at *30 (S.D. Ohio Sept. 27, 2021 (citing *Leach v. Shelby Cnty. Sheriff,* 891 F.2d 1241, 1247–48). A plaintiff must show that the prior examples of wrongdoing are similar to the case at issue and that there was a pattern of constitutional violations. *Franklin v. Franklin Cnty.*, 115 F.4th 461, 474 (6th Cir. 2024). A plaintiff "cannot rely solely on a single instance to prove the existence of an unconstitutional custom." *Winkler v. Madison Cnty.*, 893 F.3d 877, 901 (6th Cir. 2018).

Plaintiff represents that "the jail experienced a similar [diabetic ketoacidosis] death within the twelve months prior to Decedent's death." (Doc. 148 at 20.) He also alleges that the County failed to investigate that death, failed to conduct any quality-improvement meetings or perform any reviews, and failed to "take any action whatsoever to monitor the Agreement with QCHC between January 1, 2020 and December 2024." (Doc. 148 at 20–21.) However, Plaintiff has not presented any details about the previous death or the circumstances surrounding that previous death. There is no evidence that the death from DKA was due to a constitutional rights violation; in fact, such an assertion is disputed. (Doc. 177 at 7.) There is no evidence that such a violation, if it existed, was similar to Mr. McCleary's death.

Plaintiff also alleges that "the County failed to assess any penalties against QCHC since 2020 for failing to comply with the terms of the Agreement." (Doc. 148 at 21.) This may be evidence of a custom of acquiescing to contractual breaches. But this does not, on its own, demonstrate a custom of tolerance to constitutional rights violations.

In sum, Plaintiff has not shown a custom of tolerance or acquiescence to federal rights violations.

IV. **CONCLUSION**

Plaintiff has not shown that there is no genuine dispute of material fact and that he is entitled to judgment as a matter of law on his § 1983 claim against Monroe County. For the foregoing reasons, the Court will **DENY** Plaintiff's motion for summary judgment against Monroe County (Doc. 148).

**AN APPROPRIATE ORDER WILL ENTER.**

/s/
CURTIS L. COLLIER
UNITED STATES DISTRICT JUDGE